FILED
CLERK

2/2/2023 2:10 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
UNITED STATES OF AMERICA,

      -against-

FRANK LIZZA and
RAMON DE LOS SANTOS,

              Defendants.
--------------------------------X

MEMORANDUM & ORDER
19-CR-0548(JS)(AYS)

APPEARANCES
For United States:  Burton T. Ryan, Esq.
                  United States Attorney's Office
                  610 Federal Plaza
                  Central Islip, New York  11722

For Frank Lizza:    Alexander G. Bateman, Esq.
                  Ruskin Moscou Faltischek PC
                  1425 RXR Plaza, 15th Floor
                  Uniondale, New York  11556
For Ramon De
Los Santos:        John F. Carman, Esq.
                  666 Old Country Road
                  Garden City, New York  11530

SEYBERT, District Judge:

        Frank Lizza ("Lizza") and Ramon De Los Santos ("De Los Santos") (collectively, the "Defendants") are charged with participating in a multi-year scheme to avoid making payments due to benefit funds for union employees pursuant to a collective bargaining agreement.  Presently before the Court are Defendants' motions to dismiss the Indictment.  (De Los Santos Mot., ECF No. 38; Lizza Mot., ECF No. 39.)  Defendants also move for the release of the grand jury minutes, for the Government to produce a bill of particulars, and for the Government to turnover

exculpatory evidence concerning industry practices. For the reasons that follow, Defendants' motions are DENIED, except for the request for particulars, which is GRANTED IN PART.

<u>BACKGROUND</u>

Defendants are charged by a three-count Superseding Indictment that was returned by a grand jury on December 8, 2021, which provides: (1) Defendants embezzled from employee benefit plans pursuant to 18 U.S.C. § 664; (2) Defendants submitted false Employee Retirement Income Security Act ("ERISA") remittance reports pursuant to 18 U.S.C. § 1027; and (3) Defendants submitted false written statements, namely, certified payrolls to the Port Authority of New York and New Jersey (the "Port Authority") and the United States Department of Transportation, Federal Aviation Administration ("FAA"), pursuant to 18 U.S.C. § 1001. (Superseding Indictment, ECF No. 45, ¶¶ 9-15.)

According to the Indictment, Lizza was an officer of Intercounty Paving Associates LLC ("Intercounty"), a company owned by Lizza's family which provided construction and road paving services throughout New York and New Jersey. (<u>Id.</u> ¶ 1.) De Los Santos was an Intercounty employee between 2006 and 2019. (<u>Id.</u> ¶ 2.) Lizza and Intercounty's other owners also owned and operated 4L Equipment Leasing ("4L Equipment"), a corporation in the business of trucking construction materials and demolition debris to and from construction sites and landfills. (<u>Id.</u> ¶ 3.) 4L

Equipment shared a vehicle yard in Westbury, New York, with Intercounty, and supplied trucks and drivers for Intercounty's contracts. (Id.)

In 2014, Lizza and the principals of 4L Equipment and Intercounty assisted De Los Santos in his establishment of LR Safety Consultants and Construction Services, LLC ("LR Safety"). (Id. ¶ 4.) LR Safety was "purportedly" established to truck road construction materials and demolition debris to and from construction sites and landfills; however, LR Safety owned no trucks or equipment. (Id.) As such, LR Safety used trucks and employees from 4L Equipment, and also shared an office space with 4L Equipment and Intercounty. (Id.)

De Los Santos entered LR Safety into a "standard form" collective bargaining agreement ("CBA") with the International Brotherhood of Teamsters, Local 282 ("Local 282"). (Id. ¶ 5.) The CBA required that any trucking work contracted by the owners of LR Safety be performed by the union members of Local 282. (Id. ¶ 6.) This required the LR Safety owners to pay a specified hourly salary and, for each hour worked by Local 282 members, to remit payments for each LR Safety employee to Local 282's welfare, pension, annuity, job training, vacation, and sick leave trust funds (the "Union Benefit Funds"). (Id.) Further, "[t]he CBA prohibited the owner of LR Safety from diverting any work to a non-union trucking company without reporting the hours worked, and

making payment to, the workers and the Union Benefit Funds as required by the CBA for any work performed." (Id.)

Beginning in 2014, Defendants, together with others, schemed to defraud the Union Benefit Funds "by arranging to split truck drivers' daily driving hours between LR Safety's union payroll and 4L's non-union payroll, in violation of the CBA." (Id. ¶ 7.) More specifically, Defendants arranged non-union wage payments for drivers who drove to and from LR Safety's Westbury vehicle yard and construction sites. (Id.) Then, at the construction sites, the drivers were switched to the union payroll and paid union wages, which included payments to the Union Benefit Funds. (Id.) LR Safety and De Los Santos did not report the hours drivers spent before arriving at the construction sites; only the hours at the work site were reported to Local 282 and the Union Benefit Funds. (Id.) As a result, the drivers were denied union wages and the Union Benefit Funds were denied contributions for the hours that had been transferred to the non-union payroll. Further, the remittance reports LR Safety was required to submit in accordance with the CBA falsely underreported the drivers' hours, with only the hours for the drivers' traveling to and from the sites being reported. (Id. ¶ 8.)

Thereafter, between June 2014 and September 2018, De Los Santos directed the submission of certified payrolls on behalf of LR Safety to the Port Authority. (Id. ¶ 9.) These payrolls were

4

to be reviewed by the Port Authority and the FAA.  (Id.)  The
certifications contained in the payrolls specified that "payments
of fringe benefits . . . have been or will be made to appropriate
programs for the benefit of such employees."  (Id.)  In addition,
the certifications contained warnings, printed in capital letters
immediately below the signature line, stating that a false
statement in the certification may subject a contractor to criminal
prosecution under 18 U.S.C. § 1001.  (Id.)  However, De Los Santos
knew and believed LR Safety had not made, and did not intend to
make, the required benefit payments to the Union Benefit Funds.
(Id.)

                            ANALYSIS

I.    Defendants' Motions to Dismiss

      A.    Legal Standard

            Pursuant to Federal Rule of Criminal Procedure
("Rule") 12, defendants may "challenge the lawfulness of a
prosecution on purely legal, as opposed to factual, grounds."
United States v. Benitez-Dominguez, 440 F. Supp. 3d 202, 205
(E.D.N.Y. Feb. 24, 2020)(quoting United States v. Ahmed, 94 F.
Supp. 3d 394, 404 (E.D.N.Y. 2015)).  "A defendant faces a high
standard in seeking to dismiss an indictment, because an indictment
need provide the defendant only a plain, concise, and definite
written statement of the essential facts constituting the offense
charged."  United States v. Taveras, 504 F. Supp. 3d 272, 277

(S.D.N.Y. 2020)(quoting <u>United States v. Smith</u>, 985 F. Supp. 2d 547, 651 (S.D.N.Y. 2014)).

    B.   <u>Discussion</u>

       Defendants jointly move to dismiss the Indictment on several grounds: (1) an employer's failure to make contributions under a CBA does not amount to a violation of 18 U.S.C. § 664; (2) 18 U.S.C. § 664 is unconstitutionally vague as applied in this case; and (3) a CBA does not require LR Safety to make payments to drivers for travel time to and from worksites. (<u>See</u> De Los Santos Support Memo, ECF No. 38-1, at 4-9; Lizza Support Memo, ECF No. 39-1, at 4-18.) Separately, Lizza contends that he should be dismissed from this case because neither him nor 4L Equipment are parties to a CBA. (Lizza Support Memo at 16-17.) The Court will address each of these arguments in turn.

      1.   <u>Section 664</u>

Section 664 provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, <u>or other assets</u> of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 664 (emphasis added). As used in Section 664, an "'employee welfare benefit plan or employee pension benefit plan' means any employee benefit plan subject to any provision of

[ERISA]." Id. Citing Rahm v. Halpin (In re Halpin), 566 F.3d 286 (2d Cir. 2009), for the proposition that contributions which an employer has failed to pay into an employee benefit plan are not considered "assets" under Section 664, Defendants contend that contractually owed, but unpaid plan contributions cannot be the object of a Section 664 charge as a matter of law. (De Los Santos Support Memo at 6; Lizza Support Memo at 14-15.) The Court disagrees.

In United States v. O'Sullivan, the Honorable Pamela K. Chen thoroughly examined this precise issue and upheld the Government's charging theory under Section 664. See United States v. O'Sullivan, No. 20-CR-0272, 2021 WL 1979074, at *2-6 (E.D.N.Y. May 18, 2021). Judge Chen determined that "the Second Circuit has at least implicitly endorsed" such a charging theory because it has affirmed a conviction for aiding and abetting a Section 664 violation under analogous circumstances. Id. at *3 (citing United States v. LaBarbara, 129 F.3d 81, 88 (2d Cir. 1997)). Notably, the underlying facts of both O'Sullivan and LaBarbara are similar to the instant case, consisting of owners or managerial employees of corporate employers that were parties to CBAs who used companies that were not parties to the CBAs to avoid making contributions to benefits funds in accordance with the CBAs. See id. at *1, *3 (citing LaBarbara, 129 F.3d at 82-83, 88).

Defendants here attempt to diminish the weight of LaBarbara through their citations to Halpin; however, this argument is not persuasive. See Halpin, 566 F.3d at 291. The LaBarbara defendant argued that monies owed to the plans were not "plan assets" until paid. LaBarbara, 129 F.3d at 88. In response, the LaBarbara Court stated that "[o]nce wages were paid to [the Union's] members," the employer's contractual obligations to the union funds "constituted 'assets' of the [f]unds by any common definition. Certainly, an audit of the [f]unds would have to include such fixed obligations as assets. [The defendant's] acquiescence in the use of [a non-party to the CBA] as a vehicle to convert those assets . . . and to conceal [the employer's] contractual obligations aided or abetted a violation" of Section 664. Id. Then in Halpin, which arose in the context of bankruptcy proceedings, the Second Circuit reviewed LaBarbara:

> [In LaBarbara,] [w]e did not find that the unpaid funds were plan assets; rather, we concluded that [the employer's] contractual obligation to the plan was a chose in action, and hence an asset. Under this reasoning, we held that [the defendant's] crime was aiding and abetting [the] concealment of the union's right to collect funds . . . , not the concealment of any actual funds. Consequently, we see no tension between LaBarbara's holding and our analysis here.

Halpin, 566 F.3d at 291. As such, the Second Circuit expressly confirmed the continued viability of LaBarbara in Halpin. The Government's charging theory under Section 664 as alleged in the

8

Superseding Indictment is consistent with that precedent.   See id.; see also United States v. Annucci, No. 06-CR-0982, 2007 WL 1310156, at *8 (S.D.N.Y. May 3, 2007) ("The Court recognizes that LaBarbara's holding has not been universally followed in other circuits, and courts are divided about how and when employer contributions become plan assets for ERISA purposes. . . . But LaBarbara is binding precedent in this Circuit and the Court does not find a reason to depart from its holding." (citations omitted)).[1]

It necessarily follows that Defendants' vagueness challenge to Section 664 also fails.   The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Motz, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) (quoting United States v.

---

[1] Defendants also contend that the Government's Section 664 charge fails because "[t]here is no coherent sense in which one could assert that Defendants embezzled, stole, or unlawfully abstracted or converted to his own use a contractual right belonging to Local 282." (De Los Santos Support Memo at 8; Lizza Support Memo at 15-16.)   According to Defendants, to find Defendants guilty on the Section 664 charge, the jury must "find that the Defendants took something belonging to the union and used that thing for their own purposes; but the Defendants did not."   (De Los Santos Support Memo at 7; Lizza Support Memo at 16.)   The Court agrees with Defendants that such a finding is for the jury to determine,  and such a finding is one that the Court need not make for purposes of resolving the instant motions which pertain to the legal sufficiency of the Indictment.

Rybicki, 354 F.3d 124, 129 (2d Cir. 2003)).  "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."  United States v. Y%20ucel, 97 F. Supp. 3d 413, 417 (S.D.N.Y. 2015) (quoting United States v. Coppola, 671 F.3d 220, 235 (2d Cir. 2012)).  "In such cases, regardless of whatever ambiguities may exist at the outer edges of the statute, a defendant cannot successfully challenge its vagueness if his own conduct, as alleged, is clearly prohibited by the statute."  Id. (citing United States v. Nadirashvili, 655 F.3d 114, 122 (2d Cir. 2011)).

Defendants contend that Section 664, as applied by the Government here, "criminalizes any intentional failure by an employer to contribute funds to an employee benefit plan," which fails to provide reasonable notice since "on its face[,] [Section 664] appears to reach only embezzlement and theft as those concepts are understood."  (See De Los Santos Support Memo at 8; Lizza Support Memo at 17-18.)  Defendants also submit that cases involving unpaid employer contributions are "all too common" but "rarely prosecuted criminally."  (See De Los Santos Support Memo at 8; Lizza Support Memo at 17-18.)  The Court finds both of these arguments meritless.

The fact that a statute is broad does not necessarily render the statute impermissibly vague under the Constitution.

See Y%20ucel, 97 F. Supp. 3d at 419 (citing Wiemerslage ex rel. Wiemerslage v. Maine Twp. High School Dist. 207, 29 F.3d 1149, 1151 (7th Cir. 1994)).  "Rather, the question is whether the outer limits of the statute's broad reach are ill-defined, such that a substantial amount of innocent conduct is potentially prohibited." Id.  Here, the Court answers that question in the negative and notes that in LaBarbara and Halpin, the Second Circuit offered guidance concerning the interpretation of Section 664 which, for vagueness purposes, renders Defendants' reasonable notice argument specious.  See United States v. Lanier, 520 U.S. 259, 266 (1997) ("[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute . . . ."  (citations omitted)); United States v. Smith, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) ("Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well." (collecting cases)).

Defendants' grievance with the Section 664 charge primarily focuses on the Government's overarching decision to criminally prosecute rather than civilly litigate a contractual dispute, which is an insufficient basis to declare Section 664 unconstitutionally vague.  Moreover, it is not until Defendants' reply where they raise, for the first time, a claim of selective prosecution and seek discovery related thereto.  (Lizza Reply, ECF

No. 52.[2])  This argument stems from a footnote in the Government's opposition which states that a prior generation of Lizza's family members were associates of the Gambino crime family of La Cosa Nostra, as well as Defendants' "belief[] [that] other trucking companies" engage in conduct similar to Defendants' but were not prosecuted.  (See Gov't Opp'n at 16 n.4; Lizza Reply at 2-3.)

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  United States v. Armstrong, 517 U.S. 456, 468 (1996).  "To make out a claim of selective prosecution, a defendant confronts a deliberately 'rigorous standard.'"  United States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003) (citing Armstrong, 517 U.S. at 468).  This exacting standard requires a defendant to provide "clear evidence" that the prosecutorial decision or policy in question had both a discriminatory effect and was motivated by a discriminatory purpose.  Id. (citing Armstrong, 517 U.S. at 465).  A defendant must "overcome the strong presumption of regularity on the part of federal prosecutors, and 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'"  United States v. Sanders, 17 F. Supp. 2d 141, 144 (E.D.N.Y. 1998)(quoting

---

[2] De Los Santos joins in the reply filed by Lizza.  (See Aug. 17, 2022 Ltr., ECF No. 53.)

Armstrong, 517 U.S. at 464), aff'd, 211 F.3d 711 (2d Cir. 2000).
Moreover, "to receive discovery on a selective prosecution claim,
the defendant must offer 'some evidence tending to show the
existence of the essential elements of the defense.'" United
States v. Mangano, No. 16-CR-0540, 2018 WL 851860, at *9-10
(E.D.N.Y. Feb. 9, 2018)(quoting Armstrong, 517 U.S. at 468)).

Even if Lizza's family has some historical connection
with organized crime, Defendants have not proffered any evidence
to show that the Government's prosecution here was rooted in bad
faith or other impermissible considerations, which is wholly
insufficient to meet their burden for a selective prosecution claim
or to warrant discovery on the issue. United States v. Morrison,
596 F. Supp. 2d 661, 704 (E.D.N.Y. 2009), as amended (Feb. 26,
2009)("It is well established that the mere fact of selective
prosecution -- absent evidence of intentional and purposeful
discrimination on the part of the government -- is not a defense
to prosecution." (citing Oyler v. Boles, 368 U.S. 448, 456
(1962))), on reconsideration in part, 706 F. Supp. 2d 304 (E.D.N.Y.
2010), rev'd and remanded on other grounds, 686 F.3d 94 (2d Cir.
2012); see also Alameh, 341 F.3d at 173-74 ("The standard for
discovery [on a selection prosecution claim] is 'correspondingly
rigorous,' Armstrong, 517 U.S. at 468," and requires "some evidence
of discriminatory effect and intent."); Mangano, 2018 WL 851860,
at *12 (denying motion for discovery where defendants failed to

offer "some evidence tending to show the existence of the essential elements of the defense" (citing Armstrong, 517 U.S. at 468)).

    2.   <u>The CBAs</u>

    a.   <u>"Portal-to-Portal" Payments</u>

In light of the Court finding that contractually owed but unpaid payments constitute plan assets for purposes of a Section 664 charge, the Court now considers Defendants' argument as to whether LR Safety was contractually required to pay union rates for members driving trucks from the Westbury Yard to worksites at the beginning of their shifts, and from worksites back to the Westbury Yard at the end of shifts. (See Lizza Support Memo at 4-5.) In other words, was LR Safety required to make "key-to-key" or "portal-to-portal" payments under the CBAs?

There are two CBAs to which LR Safety and Local 282 were a party: the New York City Heavy Construction & Excavating Contract ("NYC CBA") and the Nassau/Suffolk Heavy Construction & Excavating and Asphalt Industry Contract ("LI CBA"). (See NYC CBA, ECF No. 41-2; LI CBA, ECF No. 41-3.) According to Defendants, both CBAs require union rates be paid for "Heavy Construction Work," and neither the NYC CBA's nor the LI CBA's definition of "Heavy Construction Work" covers driving trucks back and forth from the Westbury Yard. (See Lizza Support Memo at 4-6.) To support this argument, Defendants rely solely upon the provisions in the CBAs

which define the term "Heavy Construction Work."  Under the NYC

CBA, "Heavy Construction Work" is defined as:

> [I]ncluding but not limited to, new
> construction, i.e. building and foundation
> construction below or above street level, or
> the inspection, rehabilitation or expansion of
> an existing structure or facility involving
> any aspect of subsurface construction or
> excavation, all deconstruction or demolition
> work; all construction from excavation through
> final completion of engineered structures,
> parking garages, mass transit facilities
> including but not limited to bus depots,
> ventilation plants, maintenance shops,
> transit yards, stations, tunnels, railway
> lines and work along railway rights of way,
> highways, roads, streets, bridges, parks,
> piers, wharves and bulkheads, marine transfer
> stations, airport runways, access roads,
> airline terminals, water and wastewater
> conveyances, including but not limited to
> tunnels, and associated facilities including
> gatehouses, pump houses, valve chambers, and
> water and wastewater treatment plants, power
> plants, power generating stations, electrical
> substations, and pipelines; all excavation and
> sitework including but not limited to all
> installation, relocation or removal of
> utilities, all drainage, landscaping,
> curbsetting and paving; removal of
> contaminated materials as it pertains to heavy
> construction projects; and any construction
> commonly associated with "public works,"
> "infrastructure" or "heavy civil"
> construction, exclusive of the erection of
> building superstructures since this latter
> work is agreed to be a separate and distinct
> branch of the Construction Industry.  If the
> Employer engages in any work covered by the
> Union's High Rise Contract, both parties shall
> comply with all other conditions then existing
> in that Agreement.

NYC CBA § 1(B). The LI CBA more succinctly defines "Heavy Construction Work" as "includ[ing] the construction, improvement and modification and demolition of all or any part of streets, highways, bridges, tunnels, railroads, canals, dams, airports, schools, power generation plants, and utilities in connection therewith." LI CBA § 2(B).

Defendants' cherry-picking of these terms in the CBAs runs contrary to "the well-established rule that '[c]ontract provisions should not be read in isolation; rather, the entire contract must be considered, and all parts of it reconciled.'" United States v. Prevezon Holdings, Ltd., 289 F. Supp. 3d 446, 453-54 (S.D.N.Y. 2018)(quoting RJE Corp. v. Northville Indus. Corp., 198 F.Supp.2d 249, 262-63 (E.D.N.Y. 2002)). These sections highlighted by Defendants do nothing more than define "Heavy Construction Work" and shed no light as to how "Heavy Construction Work," or other classifications of work, are intended to be compensated, nor how members' time is computed. Notwithstanding, in reviewing the CBAs in their entirety, as the Court must in resolving matters of contractual interpretation, the Court reaches a conclusion opposite to Defendants'.

To begin, Section 13 of the NYC CBA, titled "Welfare, Pension and Annuity Trust Funds; Job Training Trust Fund," sets forth the controlling contribution rates for those respective "Funds." Regarding the Welfare and Pension Funds, LR Safety is

required to make certain contributions "for each hour worked under this Agreement, during the regular workweek (Monday-Friday), up to a maximum of forty (40) hours." See NYC CBA § 13(A), (B). With respect to the Annuity Fund, LR Safety is required to make contributions "for each hour paid at the straight time rate." Id. § 13(D). And for the "Job Training Trust Fund," LR Safety is required to make contributions "for every hour paid for, up to a maximum of forty (40) hours" per week. Id. § 13(E). Critical here, the NYC CBA does not place any limitations concerning the type of work, e.g., "Heavy Construction Work" or other, that must be performed to require LR Safety to make contributions to these Funds. Rather, these contributions are dependent upon the number of hours of work performed by union members, which is proscribed in Section 3 of the NYC CBA. This number, too, is not dependent upon the type of work performed:

> The regular workweek shall be five (5) days Monday to Friday inclusive, except as provided herein. All work beyond the regular workweek and beyond eight (8) hours in a day and before the regular starting time shall be considered overtime. Eight (8) hours shall constitute a day's work on a single shift and two shift jobs, time to be taken when arriving at the garage at A.M. and on leaving same at P.M. Overtime to be paid at the rate or time and one-half (1½) per hour. Men starting before 7:00 A.M. shall be paid at the rate of time and one-half (1½) on single shift jobs; on two (2) shift jobs starting time shall be 7:00 A.M. Time clocks are to be installed in Employers' barns.

> Work done on Saturday shall be compensated at the rate of time and one-half (1½) the straight time hourly rate, for all hours worked.
>
> Work done on Sunday is to be compensated at the rate of two (2) times the straight time hourly rate for all hours worked.

NYC CBA § 3(A)(emphasis added).  Thus, without any limitations on the type of work performed, the plain meaning of the highlighted language above in Section 3(A), which provides that a member's eight-hour workday begins "when arriving at the garage at A.M. and on leaving same at P.M.," surely encompasses portal-to-portal time.  As such, the Court agrees with the Government that, when Section 13 is read in conjunction with Section 3, "the [NYC] CBA clearly contemplates the arrival and [departure] times from garage locations as part of the hours of work for which benefit plan contributions were contractually required to be paid for work completed in New York City."  (Gov't Opp'n at 14.)  Although Defendants argue that drivers for LR Safety were, in actuality, paid for this portal-to-portal time, but not at union rates because Defendants did not consider such time covered by the CBAs (see Lizza Support Memo at 6-7; Lizza Reply at 2), any such arguments go to whether Defendants possessed the requisite intent to commit the charged crimes, and are inappropriate for the Court to consider at this stage of the proceedings.

The LI CBA does not contain identical provisions to the NYC CBA, a fact which the Government acknowledges.  (See Gov't Opp'n at 14.)   The Government notes that the LI CBA "covers the same type of work as the NYC CBA and though differences in language exist, results in the same analysis that [the drivers'] workday starts upon arriving at their truck[s]."  (Id.)   However, the Government does not point the Court to a particular provision in the LI CBA to support this conclusion.   Rather, the Government states that "[n]o justification permits even preparatory Union work be transferred to a non-Union company," (see id.), which goes to the Government's argument that the CBAs prohibit double breasted operations rather than the scope of coverable work under the CBAs. (NYC CBA § 34; LI CBA § 35.)[3]

Returning to the text of the LI CBA, Section 2(C) defines "Light Construction Work" as:

> [I]nclud[ing]   all   residential   work,
> including,  but  not  limited  to  the
> construction,  improvement  and  modification

---

[3] "In the construction industry, and elsewhere, there is a practice generally referred to as 'double breasting' pursuant to which a single commercial complex functions through two corporate entities; one, a corporation which is a party to a collective bargaining agreement and subject to its provisions; a second non-union entity which is not subject to such an agreement." Grodotzke v. Seaford Ave. Corp., 17 F. Supp. 3d 185, 191 (E.D.N.Y. 2014) (quoting U.S. for use of Tower Masonry, Inc. v. J. Kokolakis Contracting, Inc., No. 93-CV-6369, 1995 WL 539742, at *6 (S.D.N.Y. Sept. 8, 1995)).   The Government acknowledges that the formation of a double-breasted operation can be lawful at times.   (See Gov't Opp'n at 28.)

and demolition of single family, multi-family, town houses and apartment buildings, including driveways, streets, and curbs within those residential projects, and utilities in connection therewith. Light Construction shall also include the construction, improvement and modification and demolition of parking lots and garages, gas stations, and utilities in connection therewith. Light Construction Work shall include the construction, improvement and modification of retail, industrial and commercial office buildings, and utilities in connection therewith.

LI CBA § 2(C). Neither this definition nor the definition of "Heavy Construction Work" set forth above expressly cover portal-to-portal time (see id. §§ 2(B), (C)); however, time spent traveling to and from job sites can be reasonably read into these definitions as covered activities under the "including but not limited to" language. The Court also finds that portal-to-portal time may be encompassed within Section 4(A)(3), which pertains to hours of work: "An [e]mployee who finishes the day's work at a barn other than from where the [e]mployee begins the day's work will be entitled to transportation and pay back to the starting barn." (Id. § 4(A)(3).) As such, the Government's portal-to-portal allegations survive Defendants' motions to dismiss. See United States v. Thompson, 207 F. Supp. 3d 106, 109, 111-12 (D. Mass. 2016)(denying motion to dismiss indictment where "shop hours," i.e., time spent preparing for traveling to a job-site and portal-to-portal time, were "not expressly included" in the CBA's

20

definition of "covered work," but were reasonably read into the definition as part of "removal, handling, and/or packaging").[4]

It bears noting that the Government also asks the Court to interpret the CBAs in connection with: (1) the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, which "requires an employer to include time spent traveling from one workplace to another during the same workday as hours worked"; and (2) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and New York Labor Law ("NYLL") §§ 650 et seq., which "require workers to receive overtime wages when working more than forty hours in a week."   (Id. at 14-15.) The Court need not weigh in on those issues at this time for purposes of resolving the present motions.  However, the Government is on notice that to meet its burden of proof at trial, whether Defendants violated these civil statutes or breached the CBAs is

---

[4] Defendants' citation to Gesualdi v. F.G. Trucking, No. 12-CV-3450, slip op., ECF No. 108 (E.D.N.Y. Dec. 29, 2014), for the proposition that "time spent driving to mason yards and nurseries was not 'covered work' under [the] applicable CBA[s]" is misplaced. (See De Los Santos Support Memo at 9; Lizza Support Memo at 18.) In that case, the drivers delivered sand and gravel to mason supply yards and nurseries, which in turn sold the materials to the public.  Gesualdi at 11.  "The delivered sand and gravel did not have a direct connection with any construction project because the materials could have been bought and used for a variety of non-construction purposes."  Id.  As such, this delivery of sand and gravel to nurseries and mason supply yards did not constitute covered work.   Id. at 14.   The facts in Gesualdi are distinguishable from the instant case, in which the portal-to-portal time at issue specifically refers to time spent by drivers going to and from worksites/construction sites, unlike the Gesualdi drivers.

insufficient, without more, to prove this criminal case beyond a reasonable doubt at trial.

        b.    <u>Lizza's Liability as a Non-Signatory</u>

Last, Defendants argue that Counts One, Two, and Three must be dismissed against Lizza because neither Lizza nor 4L Equipment are signatories to the CBAs, and the Indictment does not allege any conduct undertaken by these non-signatories as to the signing or submission of remittance reports or payrolls, or any obligations concerning the same. (<u>See</u> Lizza Support Memo at 16-17.) The Government raises three theories of liability to demonstrate that Lizza is properly charged: (1) as an aider and abettor of De Los Santos; (2) as a principal utilizing De Los Santos and others as agents; and (3) as a co-conspirator under <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946). (Gov't Opp'n at 30-31.) Defendants do not challenge or even address any of these proffered bases for liability against Lizza in their reply. (<u>See generally</u> Lizza Reply at 4-5.)

Pursuant to 18 U.S.C. § 2(a), the aiding and abetting statute, "[w]however commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Under Section 2(a), a defendant may be convicted of aiding and abetting a crime "where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the

crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." United States v. Willis, 14 F.4th 170, 183 (2d Cir. 2021) (quoting United States v. Hamilton, 334 F.3d 170, 180 (2d Cir. 2003)). "Regardless of what the Government might be required to prove at trial as to specific intent, by alleging that defendants acted 'together with others,' and by citing to 18 U.S.C. § 2," an indictment can survive a motion to dismiss. United States v. Alshahhi, No. 21-CR-0371, 2022 WL 2239624, at *7 (E.D.N.Y. June 22, 2022), reconsideration denied, 2022 WL 3595056 (E.D.N.Y. Aug. 23, 2022). The Indictment here does exactly that by alleging Lizza, "together with others," committed the crimes charged in Counts One, Two and Three, and by citing to Section 2. (See Indictment ¶¶ 10-15.) Accordingly, the Court finds that the Government has met its pleading obligations as to Lizza and Defendants' motion to dismiss is DENIED. In light of the Court finding Lizza is properly charged as an aider and abettor, the Court need not address the Government's remaining theories of liability at this juncture.

## II.  Disclosure of Grand Jury Minutes

Defendants also move for the release of the grand jury minutes, or alternatively, for the Court to review the minutes in camera. (See Lizza Support Memo at 10-12.) Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) permits a court to disclose a grand jury matter, at a defendant's request, where a defendant

"shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." A defendant must meet a "heavy burden of showing that 'compelling necessity' outweighs countervailing public policy in order to disturb the presumption of the 'indispensable secrecy of grand jury proceedings.'" United States v. Barret, 824 F. Supp. 2d 419, 446 (E.D.N.Y. 2011) (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)). Reviewing grand jury minutes is rarely authorized "without specific factual allegations of government misconduct." United States v. Chang, 574 F. Supp. 3d 94, 98 (E.D.N.Y. 2021) (quoting United States v. Torres, 901 F.2d 205, 232-33 (2d Cir. 1990)).

To warrant disclosure of the grand jury minutes here, Defendants argue that the grand jury was improperly advised by the Government that the charged conduct in the Indictment violated the CBAs. (Id. at 10-11.) The Court has already rejected Defendants' arguments concerning the sufficiency of the Indictment and scope of the CBAs for the reasons set forth above, and those arguments certainly do not present any compelling necessity justifying disclosure of the grand jury minutes. Moreover, the Court declines to conduct an in camera review of the minutes "because there is no reason to suspect government misconduct." Chang, 574 F. Supp. 3d at 99.

III. <u>Request for Bill of Particulars</u>

Next, Defendants seek a bill of particulars because De Los Santos is a signatory to the two subject CBAs, the NYC CBA and the LI CBA, and Defendants want the Government to specify which CBA and which provision(s) were allegedly violated. (De Los Santos Support Memo at 9-10; Lizza Support Memo at 18-19.)

Rule 7(f) permits a defendant to move for a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." <u>United States v. Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir. 1987). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." <u>United States v. Chen</u>, 378 F.3d 151, 163 (2d Cir. 2004) (quoting <u>United States v. Walsh</u>, 194 F.3d 37, 47 (2d Cir. 1999)) (cleaned up). The decision whether to grant a bill of particulars is committed to the sound discretion of the district court and is reviewed only for abuse of discretion. <u>See</u> <u>United States v. Cephas</u>, 937 F.2d 816, 823 (2d Cir. 1991); <u>see also</u> <u>United States v. Barnes</u>, 158 F.3d 662, 665-66 (2d Cir. 1998).

In its opposition to Defendants' request, the Government has made clear that which CBA applies to Defendants' alleged

conduct depends on the geographic location of the construction site involved. (See Gov't Opp'n at 36-37.) To ask the Government to do more would, in essence, require the Government to disclose the precise manner in which Defendants committed the charged crimes or to preview its legal theories -- matters which the Government is not required to divulge in a bill of particulars. See United States v. Wey, No. 15-CR-0611, 2017 WL 237651, at *17 (S.D.N.Y. Jan. 18, 2017). In addition, the Government has identified the CBAs' double-breasting and subcontracting provisions, and the NYC CBA's provisions pertaining to portal-to-portal time. (Gov't Opp'n at 13-14, 37.) However, to the extent that the Government will seek to prove the LI CBA was violated due to an alleged failure to pay portal-to-portal time, the Court will require the Government to promptly identify the pertinent provision(s) in the LI CBA, should they differentiate from those discussed by the Court above. (See supra at 19-20.) Accordingly, with the exception of the portal-to-portal provisions contained in the LI CBA, Defendants' request for particulars is DENIED.

IV.  Exculpatory Evidence Regarding Industry Practice

Defendants' final request is one pursuant to Brady v. Maryland, 373 U.S. 83 (1963), which asks the Government to produce exculpatory evidence as to the payment of union wages and benefits for travel time by similarly situated employers in the New York and Long Island areas. (De Los Santos Support Memo at 10-11.)

"Under Brady and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.'" United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 91 (2d Cir. 2014) (quoting United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001)).  "Favorable evidence" that must be disclosed for purposes of Brady "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness," also known as "Giglio material."  Id.  "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different."  Coppa, 267 F.3d at 142.  As the Second Circuit noted in Coppa, the Government must disclose evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 135 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1997)).

As an initial matter, the Government does not possess the industry practice evidence that Defendants request here. (See Gov't Opp'n at 39 ("Even if the government possesses the evidence that the defendants seek, which we do not, such evidence would be marginal to the defendants' defense.").)  However, even if the Government did possess such evidence, the Court would not require disclosure pursuant to Brady.  Defendants submit that "the failure

to pay full union rates and benefits for travel time to and from a construction site [] is in fact common industry practice." (De Los Santos Support Memo at 10.) As such, Defendants are essentially seeking evidence related to industry practice to corroborate their purported knowledge as to how travel time is compensated. "[I]t is well established that Brady and its progeny do not require the Government to disclose information about the existence of exculpatory evidence where the defense has, or should have, access to that information." United States v. Zhang, 833 F. Supp. 1010, 1021-22 (S.D.N.Y. 1993) (denying defendants' Brady request for industry practice evidence, noting whether the defendants were aware of industry practice is separate from the mere existence of industry practice). Further, as stated by the Government, to the extent Defendants seek to utilize industry practices evidence to mitigate criminal intent, "they must establish that the practice – more than just being popular – is in fact legal." (See Gov't Opp'n at 39.) "The fact that other companies may or may not have been confused about the . . . rules is irrelevant to show that [the defendants] [were] confused regarding these rules." See United States v. Nicholas, No. 08-0139, 2009 WL 10710392, at *1 (C.D. Cal. Aug. 3, 2009) ("Even a universal industry practice may still be fraudulent." (quoting Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d

266, 274 (3d Cir. 1998))).  Accordingly, Defendants' <u>Brady</u> request is DENIED.

<u>CONCLUSION</u>

For the stated reasons, **IT IS HEREBY ORDERED that** Defendants' motions are DENIED in all respects, with the exception that the Government must identify the pertinent provisions of the LI CBA applicable to portal-to-portal violations.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: February 2, 2023
       Central Islip, New York